UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

RENEE M. HAWKINS, individually and on be-           )
half of others similarly situated,                 )
    *Plaintiff*,                                     )
                                                   )    2:11-cv-00283-JMS-WGH
    *vs.*                                            )
                                                   )
ALORICA, INC.,                                     )
    *Defendant*.                                     )

## ORDER

In October 2011, Plaintiff Renee Hawkins filed a Complaint asserting claims against De-
fendant Alorica, Inc. ("Alorica") for failing to pay wages in violation of the Fair Labor Standards
Act ("FLSA") and the Indiana Wage Payment Act ("IWPA"). [Dkt. 1.] Presently before the
Court are Ms. Hawkins' Motion to Certify Combined Class Action and FLSA Collective Action,
[dkt. 36], Motion for Approval of Class and Collective Action Notice, [dkt. 38], Supplemental
Motion to Certify Combined Class Action and FLSA Collective Action, [dkt. 77], and Revised
Motion for Approval of Class and Collective Action Notice, [dkt. 79].

## I.
### BACKGROUND

Alorica opened a call center in Terre Haute, Indiana in April 2008. [Dkt. 61-3 at 2, ¶ 3.]
Alorica has employed as many as 500 customer service representatives ("CSRs") at the Terre
Haute call center at any given time. [Dkt. 37-2 at 1, ¶ 4.] Most CSRs are scheduled to work for-
ty hours per week, [*id.* at 2, ¶ 6], and they are paid at an hourly rate of between $8.00 and $9.50,
[dkts. 37-1 at 1, ¶¶ 4-5; 37-2 at 2, ¶ 6; 37-3 at 2, ¶ 6]. Since its opening, CSRs at the Terre Haute
call center have primarily fielded calls from AT&T customers. [Dkts. 37-1 at 1, ¶3; 37-2 at 1-2,

¶ 5;  37-3 at 2, ¶ 5.]  In August 2008, Ms. Hawkins began her employment with Alorica as a CSR at the Terre Haute call center.  [Dkt. 58 at 2-3, ¶¶ 1-3.]

Upon arriving at the Terre Haute call center, CSRs must swipe an employee identification badge to enter.  [Dkt. 61-3 at 6, ¶ 15.]  CSRs' time is tracked through Alorica's Avaya phone system, a typical desktop phone.  [Dkt. 61-5 at 2-3, ¶ 3.]  CSRs clock in and out by entering their personal identification number on the telephone, which then logs them in or out of the telephone system and records their time at work.  [*Id.*]  CSRs are not "on the clock" for purposes of being paid until they log on to their phones.  [*Id.*]

Alorica uses a program called Employee Information System ("EIS") to track CSRs' time.  [*Id.* at 3, ¶ 4.]  Specifically, in addition to tracking when a CSR logs in and out of his or her phone for purposes of calculating the beginning and end of a shift, [*id.*], EIS also uses auxiliary ("AUX") codes to keep track of a CSR's status, such as whether they are in a meeting or on a break and cannot take a call, or whether they are ready and waiting to take a call.  [*Id.*; dkts. 61-6 at 2-3; 61-7 at 2-3.]  Alorica claims that CSRs are automatically entered into AUX code "0" immediately upon logging in to the phone system, which prevents them from receiving calls so that they can log on to the computer and open their computer applications.  [Dkt. 61-6 at 3, ¶ 5.]  Other than the "lunch" AUX code, all of the time that CSRs are in an AUX code is paid time.  [Dkt. 61-5 at 3, ¶ 4; 61-6 at 2-3, ¶ 4.]

**A.  Pre- and Post-Shift Work**

*1.  Ms. Hawkins' Allegations*

Ms. Hawkins alleges that Alorica had a policy and practice throughout the Terre Haute call center of requiring CSRs to perform certain pre-shift work before logging in to the Avaya phone system – and thus not receiving compensation for that work.  Specifically, she alleges that

supervisors instructed CSRs that they had to arrive ten to fifteen minutes before their shift began to boot up their computers, initialize software programs, and review notes from supervisors before "clocking in" by logging on to their phones.  [Dkts. 37-1 at 3, ¶¶ 11, 15; 37-2 at 3, ¶¶ 11-12; 37-3 at 3, ¶¶ 11-12; 37-4 at 2, ¶ 8; 37-5 at 2, ¶¶ 8-10; 86 at 8.]  She also claims that Alorica required CSRs to work after logging off the phone system, thus not receiving compensation for that work.  [Dkt. 86 at 8.]  She cites time spent reviewing and responding to reports called "exceptions" as an example of such post-shift work.  [Dkts. 37-1 at 3, ¶ 12; 37-2 at 3, ¶ 13; 37-3 at 3, ¶ 13; 37-4 at 2, ¶ 10; 37-5 at 2, ¶ 11; 86 at 8-9.]

Ms. Hawkins alleges that the existence of a policy and practice of requiring CSRs to complete pre-shift work prior to logging on to the phone system is supported by several documents.  First, she points to a portion of the Alorica-Terre Haute Policy Handbook entitled "Reporting to Work and Working Your Assigned Shift" ("Handbook Document"), which provides:

> **You are considered late (tardy) if you are not at work, logged-on to your phone and ready to work by your specified start time.**  You should remain logged-on and ready to work until your specified end time or it will be considered a deviation and you will accrue points.

[Dkt. 37-7 at 1 (emphasis in original).]

Second, Ms. Hawkins cites a document entitled "Carrie's Team – Steps To Success" ("Carrie's Team Document"), which states that:

> YOU ARE TO BE LOGGED IN YOUR SYSTEMS AND AUTO-ED IN BY YOUR SCHEDULED TIME IN.  THIS MEANS YOU SHOULD BE HERE ABOUT 10 MIN PRIOR TO STARTING YOUR SHIFT SO YOU ARE READY ON TIME!!

[Dkt. 37-8 at 1.]

Third, Ms. Hawkins points to a document entitled "Ways To Prevent Excessive AUX Usage" ("AUX Usage Document") which provides: "Always be auto in and ready to take calls at

the beginning of your shift.  It is unacceptable to use an AUX code while pulling up your systems at the start of your shift."  [Dkt. 37-9 at 1.]

Finally, Ms. Hawkins presents a chain of email messages beginning with an April 8, 2010 email message from Jeannine McConnell, Alorica Human Resource Manager, which states:

> Just a quick heads up.  I have received some feedback from focus groups that they are required to log into their computers and pull up systems prior to logging into their phones.  If this is occurring we must change that practice immediately.  Pulling up computer systems is work related activity.  Agents must be paid for this. Agents need to log into their phones first, then they can go into AUX 0, then they can pull up their computers.  Get with your Ops Manager if you have any questions.

[Dkt. 37-10 at 1 ("McConnell Email").]  The McConnell Email was sent to a distribution list which included all Team Managers at the Terre Haute call center.  [Dkt. 64-3 at 6-7.]

Ronald Malone, a Team Manager, responded to Ms. McConnell's message that same day, stating:

> [N]ow on that note, per [D]ewayne I was told that yes they can log into the phones first and pull up their systems, but they are scheduled at 12:00 o'clock to be taking phone calls for example so he has asked they be in 15 min or so early to get the systems up…so this is like manditory [sic] 1.25 extra hours every week. [I]s this correct or should they get 15 minutes out of thier [sic] scheduled day to pull up the systems?

[Dkt. 64-1 at 1 ("Malone Email").]

Glenn Gettinger, an Alorica Information Technology employee, also responded, writing:

> Let's talk about this Friday.  I have been asking agents to "Cold Boot" the computer at the beginning of shift and at lunch if necessary.  Agents are advised to leave the computer ON all night to do updates and virus scans.  Thus, if they often need to "Shutdown to Install Updates" at the beginning of their shift this will take 10 minutes where they can do nothing else but have a cup of coffee or talk to their friends.  I do not see why this needs to be paid time, but they need to do it at least once every day.  It is best done at the beginning of shift, break, or lunch.  If not done, their computer will run slow and give them a frustrating experience.  Are they complaining for not being paid while the computer is booting back up and they stand around and watch or chat with friends?

- 4 -

[Dkt. 64-2 at 1 ("Gettinger Email").]

Ms. Hawkins has submitted her own declaration and several declarations from other CSRs and some Alorica Team Managers which state that fourteen other Alorica employees instructed them to perform pre- and post-shift work while not logged on to the phone system, although it is not clear from the declarations what positions the fourteen individuals held.  [Dkts. 37-1 at 3, ¶ 15; 37-4 at 2, ¶ 11; 37-5 at 2, ¶ 12.]

   2.   *Alorica's Position*

Alorica argues that its policy and practice is to "pay CSRs in full for all time spent performing work-related activities."  [Dkts. 61-5 at 2-3, ¶ 3; 89 at 13.]  Specifically, CSRs receive nine weeks of training prior to handling calls, and are taught how to log in to the phone system and how to use AUX codes to indicate their status.  [Dkt. 61-6 at 2-3, ¶¶ 4-5.]  They receive a memorandum on their first day of training instructing them not to perform any work-related activities while logged out of the phone system, [*id.* at 3-4, ¶ 7], which states "[t]he **FIRST** thing you should do at the start of your shift is to log in to your desktop Avaya phone before commencing any and all work (work includes any necessary computer boot ups, application starts, meetings, checking EIS messages, and any other work related activity, etc.)" (emphasis in original), [dkt. 61-2 at 26].

Alorica claims that CSRs are not required "to log in to their computer or open any computer applications before logging in to the phone system."  [Dkt. 89 at 15; *see also* dkts. 61-3 at 3, ¶ 7; 61-8 at 3, ¶ 4; 61-9 at 3, ¶ 4; 61-10 at 3, ¶ 4; 61-11 at 3, ¶ 5; 61-14 at 3, ¶ 5.]  Alorica seems to acknowledge that *some* managers and trainers may have required CSRs to do so, but argues that: (1) Ms. Hawkins only points to "a few managers and trainers," [dkt. 89 at 16]; (2) the CSRs who submitted declarations have no idea what other managers may have required,

[*id.*]; (3) even among those managers who may have instructed CSRs to report to work prior to their scheduled shift, the time periods varied from two minutes to twenty minutes, [*id.*]; and (4) if CSRs logged in to their computer before logging on to the phone system, the time it took them to open computer applications and get ready to receive calls ranged from three minutes to fifteen minutes, [*id.*].

As for post-shift work, Alorica states that CSRs "are not required to prepare 'exceptions' reports off the clock." [Dkt. 89 at 17; *see also* dkts. 61-3 at 4, ¶ 9; 61-8 at 3-4, ¶ 5; 61-9 at 3-4, ¶ 5; 61-10 at 3, ¶ 5; 61-11 at 4, ¶ 7; 61-14 at 4, ¶ 7.] It also states that Ms. Hawkins' current Operations Manager and Team Manager never instructed her to prepare "exceptions" reports while logged out of the phone system, and have never observed her doing so. [Dkt. 89 at 17; *see also* dkts. 61-11 at 4, ¶ 8; 61-14 at 4-5, ¶ 9.]

Finally, Alorica states that if a CSR notices any inaccuracy in his or her time records or paychecks, it is his or her responsibility to bring that inaccuracy to Alorica's attention according to a procedure set forth in the Employee Handbook. [Dkts. 61-5 at 3, ¶ 6; 80-1 at 3, ¶ 6; 89 at 14, 35.] Alorica denies receiving complaints from the CSRs who submitted declarations in support of Ms. Hawkins' pre- and post-shift work allegations regarding inaccuracies in their paychecks due to failure to compensate for pre- or post-shift work. [Dkt. 89 at 14; *see also* dkts. 61-2 at 11-12; 61-4 at 12-13.]

**B. Unpaid Breaks**

*1. Ms. Hawkins' Allegations*

Ms. Hawkins alleges that Alorica had a policy and practice throughout the Terre Haute call center of not paying its CSRs for certain break time. Alorica provided CSRs with two ten-minute breaks per eight-hour shift and three per ten-hour shift, [dkt. 80-2 at 2-3, ¶ 4]. Ms. Haw-

kins claims that if a CSR had already used his or her allotted break time, he or she was then required to log off the phone, and thus not be paid, for any additional breaks – even those lasting less than twenty minutes.  [Dkt. 86 at 12-14; *see also* dkts. 78-10 at 2-4; 78-11 at 2-5; 78-12 at 2-7; 78-13 at 2; 78-14 at 2-7; 78-15 at 2-4.]  Ms. Hawkins alleges that Alorica's "login/logout data," which shows time clock entries for CSRs, will also show any chunks of time that are less than twenty minutes, where the CSR was logged off the phone system.  [Dkt. 86 at 12.]  This data, Ms. Hawkins claims, will show the amount of time that each CSR took a break that lasted less than twenty minutes without being compensated.  [*Id.*]  Ms. Hawkins claims that in May 2012, at least one Team Manager, Barbara Quarazzo, instructed her team of CSRs that they should no longer log off the phone system during their shift.  [Dkts. 86 at 15; 78-1 at 2, ¶ 8.]

2. *Alorica's Position*

Alorica maintains that "CSRs are instructed to take breaks when logged in to the phone system."  [Dkt. 89 at 18; *see also* dkts. 61-3 at 6, ¶ 13; 61-8 at 5, ¶ 9; 61-10 at 5, ¶ 9; 61-11 at 6-7, ¶ 15.]  It argues that CSRs are compensated for a minimum of two rest breaks per shift, [dkts. 61-4 at 12; 80-5 at 3-4; 80-14 at 5; 80-15 at 3-4; 89 at 18], and that how breaks are treated varies depending on the circumstances and the team managers' preferences, [dkts. 80-4 at 4-5; 89 at 18-19].  Alorica claims that some CSRs did not log off the phone system for breaks over and above their allotted breaks, while others typically did.  [Dkt. 89 at 19; *see also* dkts. 80-5 at 7; 80-15 at 4.]

**C.  The Litigation**

Ms. Hawkins initiated this litigation on October 18, 2011, [dkt. 1], and filed the operative Amended Complaint on April 12, 2012, [dkt. 58].[1]  She asserts claims against Alorica on behalf

---

[1] Alorica involuntarily terminated Ms. Hawkins at the end of April 2012.  [Dkt. 96 at 1.]

of herself and all similarly-situated current and/or former hourly-paid employees of Alorica who worked at the Terre Haute call center for failure to pay minimum wages and overtime wages under the FLSA, 29 U.S.C. § 216(b), and on behalf of a class of current and former Alorica employees for unpaid wages under the IWPA I.C. 22-2-5.[2]

## II.
### DISCUSSION

At the outset, the Court notes the Seventh Circuit Court of Appeal's recent instruction that "employees who institute a collective action against their employer under the terms of the [FLSA] may at the same time litigate supplemental state-law claims as a class action certified according to Federal Rule of Civil Procedure 23(b)(3)." *Ervin v. OS Rest. Servs.*, 632 F.3d 971, 973-74 (7th Cir. 2011). *See also Robertson v. Steamgard*, 2012 U.S. Dist. LEXIS 51582, *4 (N.D. Ill. 2012) ("the Seventh Circuit has held that the FLSA is 'amenable to state-law claims for related relief in the same federal proceeding'"). This Court will heed that instruction, and finds it proper that Ms. Hawkins has brought, and seeks certification of, both her FLSA claims and her IWPA claims in the same litigation.

### A.  FLSA Claims

#### 1.  Collective Action Certification Standard

The FLSA provides that an action for unpaid minimum wages or unpaid overtime compensation may be brought "by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). A collective action differs significantly from a class action brought pursuant to Federal Rule of Civil Procedure 23. *Moss v. Putnam County Hosp.*, 2010 U.S. Dist. LEXIS 74735, *4 (S.D. Ind. 2010). The primary differ-

---

[2] Ms. Hawkins has excluded from her proposed IWPA classes "any employee whom Alorica involuntarily terminated from employment between October 18, 2009 and October 18, 2011." [Dkt. 96 at 4-5.]

ence is that plaintiffs who wish to be included in a collective action must affirmatively opt in by filing a written consent with the Court, while members of a Rule 23 action are automatically included unless they affirmatively opt out.  *Alvarez v. City of Chicago*, 605 F.3d 445, 448 (7th Cir. 2010).  Rule 23 and its standards governing class certification do not apply to a collective action brought under the FLSA.  *Moss*, 2010 U.S. Dist. LEXIS 74735 at *5.

An employee may only bring a collective action on behalf of other employees who are similarly situated.  29 U.S.C. § 216(b).  Therefore, to decide whether to initially certify a collective action, the Court must determine whether members of the proposed class are, in fact, similarly situated.  *Campbell v. Advantage Sales & Mktg., LLC*, 2010 U.S. Dist. LEXIS 87077, *10 (S.D. Ind. 2010).  Courts within this Circuit typically use a two-step inquiry.  *Scott v. NOW Courier, Inc.*, 2012 U.S. Dist. LEXIS 43710, *22 (S.D. Ind. 2012); *Lallathin v. Ro Ro, Inc.*, 2010 U.S. Dist. LEXIS 64096, *2 (S.D. Ind. 2010).

The first step, also known as the notice stage, involves analysis of the pleadings and affidavits that have been submitted to determine whether notice should be given to potential class members.  *Campbell*, 2010 U.S. Dist. LEXIS 87077 at *9.  Although the first step of certification does not impose a high burden on the plaintiff, "this does not mean that the 'modest factual showing' is a mere formality."  *Id.* at *11.  It serves as an important and functional step in the certification process because "it would be a waste of the Court's and the litigants' time and resources to notify a large and diverse class only to later determine that the matter should not proceed as a collective action because the class members are not similarly situated."  *Adair v. Wis. Bell, Inc.*, 2008 U.S. Dist. LEXIS 68942, *9-10 (E.D. Wis. 2008) (citation omitted).

The second step of certification occurs after discovery has largely been completed and allows a defendant the opportunity to seek decertification of the class or restrict the class because

various putative class members are not, in fact, similarly situated as required by the FLSA.  *Id.* at *7.  Under this more stringent inquiry, courts typically consider the following factors: "(1) whether plaintiffs share similar or disparate factual and employment settings; (2) whether the various affirmative defenses available to the defendant would have to be individually applied to each plaintiff; and (3) fairness and procedural concerns."  *Threatt v. CRF First Choice, Inc.*, 2006 U.S. Dist. LEXIS 50934, *19 (N.D. Ind. 2006).

The FLSA does not define the term "similarly situated" or instruct judges when to exercise their discretion and authorize notice to potential plaintiffs.  *Raymer v. Mollenhauer*, 2010 U.S. Dist. LEXIS 84273, *3 (N.D. Ind. 2010).  Courts have held, however, that being similarly situated does not require identical positions of the putative class members; instead, it requires that common questions predominate among the members of the class.  *Campbell*, 2010 U.S. Dist. LEXIS 87077 at *10; *Alvarez*, 605 F.3d at 449.

When a plaintiff seeks conditional certification of a FLSA class after significant discovery, the court can "collapse the two stages of the analysis and deny certification outright."  *Purdham v. Fairfax County Pub. Schs.*, 629 F.Supp.2d 544, 547 (E.D. Va. 2009).  At this in-between stage, when substantial discovery has taken place – and where the Court believes the parties here currently find themselves[3] – an intermediate level of scrutiny is applied.  *Scott*, 2012 U.S. Dist. LEXIS 43710 at *23-24.  Accordingly, the Court will consider whether Ms. Hawkins has presented evidence which supports a finding that she is similarly situated to putative class members.

---

[3] The Court notes that, in briefing on Ms. Hawkins' Motions to Certify, the parties rely upon fifteen declarations and excerpts from ten depositions, including some depositions of Alorica's 30(b)(6) witnesses.  Further, Alorica notes and Ms. Hawkins does not dispute that the parties have served and responded to discovery requests and "have exchanged over 6,000 pages of documents."  [Dkt. 89 at 25.]

### 2. *Pre- and Post-Shift Work*

In connection with her pre- and post-shift work allegations, Ms. Hawkins seeks conditional certification of the following FLSA class:

> Present and former hourly-paid customer service employees who work or worked for Alorica at its Terre Haute call center at any time from October 18, 2008 to the present, and who were not paid regular wages or overtime compensation for time spent on the following: (1) pre-shift work activities (including time spent pulling up computer systems) prior to logging-in to Alorica's system, and/or (2) post-shift work activities (including time spent on "exceptions" reports) after logging-off Alorica's system.

[Dkt. 36 at 2.]

Ms. Hawkins relies on the Handbook Document, Carrie's Team Document, AUX Usage Document, and McConnell Email, maintaining that Alorica had a written policy of requiring, and not compensating for, pre- and post-shift work. [Dkt. 86 at 43-44.] Accordingly, she argues, she is similarly situated to putative class members because they were all "subjected to written policies created by Alorica and distributed to [CSRs] at the Terre Haute Call Center." [Dkt. 86 at 44.]

Alorica argues that Ms. Hawkins has not shown she is similarly-situated to the putative class members because she has only provided "anecdotal testimony regarding off-the-clock work related to two isolated supervisors, during a fractured and discrete period of time, and [has] failed to point to any overall Alorica policy or practice that allows or advocates off-the-clock work." [Dkt. 89 at 27 (emphasis in original).] It claims that the written documents Ms. Hawkins relies upon do not show there was a policy or practice throughout the Terre Haute call center of requiring pre- and post-shift work because: (1) the Carrie's Team Document was distributed by two individual Team Managers, Carrie Regynski and Barbara Quarazzo, during a discrete period

of time in November 2008, "merely provided suggestions on how CSRs could increase perfor-

mance on their specific team," and did not instruct CSRs to perform work-related activity with-

out being logged in to the phone system or suggest that CSRs would not be paid for time spent

performing work-related activities, [dkt. 89 at 38]; (2) the AUX Usage Document also "provided

suggestions on how CSRs could increase performance," Alorica does not know who created the

document, when it was distributed, or who received it, and the document did not instruct CSRs to

perform work-related activity without being logged in to the phone system or suggest that CSRs

would not be paid for time spent performing work-related activities, [*id.*]; and (3) the McConnell

Email was "simply…a reminder to Alorica management" that CSRs must log into their phones

first before pulling up their computer applications, [*id.*].[4]

The Court finds that Alorica has rebutted Ms. Hawkins' assertion that it had a company-

wide policy or practice throughout the Terre Haute call center of requiring CSRs to perform un-

compensated pre- and post-shift work.  Ms. Hawkins' documentary evidence, even taken as a

whole, does not demonstrate the existence of such a policy or practice.  The Handbook Docu-

ment merely provides that a CSR is considered late if he or she is not logged in to the phone and

ready to work at the shift's start time.  [Dkt. 37-7 at 1.]  It does not say anything about logging

on to the computer or performing other work before logging in to the phone system, being ready

to take calls right at the beginning of a shift (which would arguably mean being logged on to the

computer before that time, since access to the computer system is presumably required in order

to effectively handle a call), or logging off before completing all work for the day.  Additionally,

---

[4] Alorica also asserts that Ms. Hawkins is not similarly situated to: (1) CSRs who had different
trainers and supervisors and were trained to answer different types of customer calls, [dkt. 89 at
28]; (2) CSRs who frequently used AUX codes to track work time during their shifts, [*id.* at 29-
30]; (3) putative class members who were not CSRs for the entire duration of their employment,
[*id.* at 30]; or (4) putative class members who performed non-work-related tasks prior to the start
of their shift, [*id.*].

Ms. Hawkins has not put forth any evidence that the Carrie's Team Document was distributed to anyone other than those supervised by Carrie Regynski and Barb Quarazzo.  Further, even assuming the AUX Usage Document somehow instructs CSRs to log on to their computers before logging on to their phones, the evidence Ms. Hawkins submitted does not indicate that the document was distributed to all CSRs, or even more than a few.  Ms. Regynski testified that she was not sure if she had distributed it to her team, [dkt. 80-14 at 11], and Alorica's Vice President of Human Resources testified that the document does not reflect Alorica's policy or practice, and that Alorica does not know who drafted the document, when it was distributed, or which, if any, CSRs received the document, [dkt. 61-5 at 4, ¶ 8].  Finally, while the McConnell Email, Malone Email, and Gettinger Email support the conclusion that *some* supervisors or trainers may have instructed CSRs that they were required to log in to their computers and pull up their systems before logging in to their phones, the emails do not demonstrate a policy or practice throughout the Terre Haute call center of requiring such pre- and post-shift work.  In fact, the McConnell Email supports the conclusion that the company policy was the opposite of what Ms. Hawkins claims occurred in her case.

Additionally, testimony put forth by Alorica reinforces the conclusion that only certain supervisors required their CSRs to perform pre- and post-shift work.  Specifically, James Taylor (Site Director at the Terre Haute call center), William Brewer (Alorica Vice President of Human Resources), Mindy Russell (Training Manager), Debra Carey (Payroll Administrator), Tara Anderson (Operations Manager), Kevin Carpenter (Operations Manager), David Lennon (Operations Manager), Bill Lower (Operations Manager), and Amy Bonner (Team Manager) all submitted declarations stating that Alorica's policy is to compensate CSRs for all time spent performing work-related activities, and that the first thing CSRs should do at the beginning of their shift is to

log on to the phone system, and the last thing they should do before leaving is to log out.  [Dkts. 61-3 at 3, ¶¶ 7-12; 61-5 at 2-3, ¶¶ 3-5; 61-6 at 2-4, ¶¶ 4-7; 61-7 at 2-3, ¶¶ 3-4; 61-8 at 2-5, ¶¶ 3-8; 61-9 at 2-5, ¶¶ 3-8; 61-10 at 2-5, ¶¶ 3-8; 61-11 at 2-7, ¶¶ 3-14; 61-14 at 2-6, ¶¶ 3-15.]  This testimony is enough to rebut Ms. Hawkins claim that Alorica had a policy and practice throughout the Terre Haute call center of requiring CSRs to perform uncompensated pre- and post-shift work.  *See Scott*, 2012 U.S. Dist. LEXIS 43710 at *30-32 (denying conditional certification of FLSA class where defendant had rebutted plaintiff's assertion of the existence of a company-wide policy or practice).

The Court notes that the call center cases cited by Ms. Hawkins where courts granted conditional certification of an FLSA class were all decided under the lenient standard applied before significant discovery had taken place, and where defendant had not presented any conflicting evidence to indicate either that a policy or practice did not exist, or that it was not company-wide.  *See* cases cited at Dkt. 86 at 19-20, n.5.[5]  Conversely, here, when presented with evidence which contradicts Ms. Hawkins' claim that Alorica had a policy and practice throughout the Terre Haute call center of requiring, and failing to compensate for, pre- and post-shift work, the Court will not "stick its head in the sand" and ignore that evidence.  *See Merriweather v. Southwest Research Inst.*, 2010 U.S. Dist. LEXIS 117297, *10 (S.D. Ind. 2010).  Rather, it is

---

[5] These cases include *Hargrove v. Ryla Teleservices, Inc.*, 2012 U.S. Dist. LEXIS 17723 (E.D. Va. 2012); *Swarthout v. Ryla Teleservices, Inc.*, 2011 U.S. Dist. 142408 (N.D. Ind. 2011); *Robinson v. Ryla Teleservices, Inc.*, 2011 U.S. Dist. LEXIS 147027 (S.D. Ala. 2011); *Russell v. Ill. Bell Tel. Co.*, 575 F.Supp.2d 930 (N.D. Ill. 2008); *Fisher v. Mich. Bell Tel. Co.*, 665 F.Supp.2d 819 (E.D. Mich. 2009); *Bishop v. AT&T Corp.*, 256 F.R.D. 503 (W.D. Pa.. 2009); *Burch v. Qwest Communs. Int'l, Inc.*, 500 F.Supp.2d 1181 (D. Minn. 2007); *Sherrill v. Sutherland Global Servs.*, 487 F.Supp.2d 344 (W.D. N.Y. 2007); *Clarke v. Convergys Customer Mgmt. Group, Inc.*, 370 F.Supp.2d 601 (S.D. Tex. 2005); *Hens v. ClientLogic Operating Corp.*, 2006 U.S. Dist. LEXIS 69021 (W.D. N.Y. 2006); *Beasely v. GC Servs. LP*, 270 F.R.D. 442 (E.D. Mo. 2010); *Dernovish v. AT&T Operations, Inc.*, 2010 U.S. Dist. LEXIS 2127 (W.D. Mo. 2010); and *Lepkowski v. Telatron Mktg. Group*, 766 F.Supp.2d 572 (W.D. Pa. 2011).

properly considered in order to determine whether Ms. Hawkins has met her certification burden. *Id.*

While it is possible that Ms. Hawkins is similarly situated to some sub-classes of CSRs, she has not proposed any such sub-classes and the Court is unable to determine based on the facts before it whether those sub-classes exist or how they could be defined. *See Scott*, 2012 U.S. Dist. LEXIS 43710 at *35-36 ("We are prepared to concede that there may conceivably be some sub-groups of NOW drivers composed of sufficiently homogeneous groups to allow a finding that they are similarly situated to one another. No such subsets have been proposed by Plaintiffs, however, and we have no independent factual basis on which to propose how they might exist").

Accordingly, the Court denies Ms. Hawkins' motion for conditional certification of her FLSA pre- and post-shift work class.

### 3. Unpaid Breaks

Ms. Hawkins' request for conditional certification of her FLSA unpaid breaks claim fares better. She seeks conditional certification of the following class:

> Present and former customer service representatives who work or worked at Alorica's Terre Haute call center at any time from October 18, 2008 to the present and who, as shown by Alorica's records it identifies as "LOGIN/LOGOUT DATA," were not paid regular wages and/or overtime compensation on one or more occasions for time spent in a work rest period or break of less than twenty minutes.

[Dkt. 77 at 1-2.]

Ms. Hawkins alleges that the FLSA requires that employees be compensated for rest breaks of less than twenty minutes, and that Alorica had a policy or practice throughout the Terre Haute call center of requiring employees to log out of their phone systems for these types of breaks, and thus not compensating them for those breaks. She submits excerpts from the deposi-

tions of six employees to support her claim.  [Dkts. 78-10 at 2-4; 78-11 at 2-5; 78-12 at 2-7; 78-13 at 2; 78-14 at 2-7; 78-15 at 2-4.]  Ms. Hawkins asserts that it will be easy to determine the length of any unpaid breaks by examining login/logout data provided by Alorica during discovery, [*see, e.g.*, dkts. 78-3; 78-4; 78-5; 78-6; 78-7; 78-8].

For its part, Alorica argues that the circumstances surrounding an individual employee's breaks, and whether they were compensated, varies.  Its current Site Direct at the Terre Haute call center, James Taylor, submitted a Declaration stating that "CSRs receive two paid rest breaks during each eight-hour shift and three paid rest breaks during each ten-hour shift.  These breaks have ranged from ten minutes to fifteen minutes in length depending on business needs.  CSRs are instructed to stay logged in to the phone system during their rest breaks and to use a Break AUX code, which is a paid AUX code to indicate that they are on a break."  [Dkt. 80-2 at 2-3, ¶ 4; *see also* dkts. 80-6 at 5, ¶ 9; 80-7 at 7, ¶ 16; 80-9 at 5, ¶ 9; 80-10 at 6-7, ¶ 15; 80-11 at 6, ¶ 13.]  Mr. Taylor further stated that if CSRs take a break at an unscheduled time, they are issued "points" in accordance with Alorica's Attendance Policy.  [Dkt. 80-2 at 3, ¶ 5.]

The FLSA provides that:

> Rest periods of short duration, running from 5 minutes to about 20 minutes, are common in industry.  They promote the efficiency of the employee and are customarily paid for as working time.  They must be counted as hours worked.  Compensable time of rest periods may not be offset against other working time such as compensable waiting time or on-call time.

29 C.F.R. § 785.18.

Even where a company has provided for scheduled breaks, and the employee takes an unscheduled break in addition to those scheduled breaks, the employer must compensate for the additional, unscheduled break if it is less than twenty minutes.  *See* U.S. Department of Labor Opinion, 1996 DOLWH LEXIS 39, *1-3 (1996) (employer requested that Department of Labor

- 16 -

advise whether short smoking breaks of 3 to 4 minutes were compensable when taken in addition to other breaks allowed to employees, and Department of Labor stated "[t]he FLSA does not require an employer to provide its employees with rest periods or breaks.  If the employer decides to permit short breaks, however, the time is compensable hours worked").  While this rule may seem to lead to a slippery slope, where the employee is taking multiple, unscheduled nineteen minute breaks over and above his or her scheduled breaks for example, the employer's recourse is to discipline or terminate the employee – not to withhold compensation.

The Court finds that, even under the intermediate standard, Ms. Hawkins has sustained her burden for conditional certification of the FLSA unpaid breaks class.  She has set forth evidence that at least some CSRs were instructed to log off the phone system for breaks over and above their scheduled breaks, even if they lasted less than twenty minutes.  Alorica has not presented conflicting evidence.  Significantly, while it presented declarations from Alorica management stating that CSRs are entitled to certain scheduled breaks and are told not to log off the phone for those breaks, none of those declarations address the situation where a CSR uses his or her scheduled, paid breaks and then takes an extra break of less than twenty minutes.  Additionally, Alorica's Vice President of Finance, Cece Pan, testified that "[i]n 2009, employees were provided two ten-minute breaks every day.  If a CSR exceeds their allotted break time, they were required to call out of the telephone for the additional break time."  [Dkt. 78-2 at 4.]  Simply put, Alorica does not set forth evidence indicating that CSRs are compensated for those extra breaks.

The Court also is persuaded that the login/logout data will be an accurate indication of how many instances per day a CSR was logged off his or her phone for less than twenty minutes and, thus, not compensated.  While Alorica claims that "[t]here could be any number of reasons why a CSR's time records show [a] less than 20-minute clock out, including computer malfunc-

tion, telephone log in malfunction, CSR manipulation, simple mistakes, and many others," [dkt. 89 at 27], it has not explained why CSRs should not be compensated for those scenarios.[6]

Ms. Hawkins' motion for conditional certification of the FLSA unpaid breaks class is granted.

### B.  Certification of IWPA Claims Under Rule 23

#### 1.  *Rule 23 Class Certification Standard*

In deciding whether to certify a class, the Court may not blithely accept as true even the well-pleaded allegations of the complaint but must instead "make whatever factual and legal inquiries are necessary under Rule 23" to resolve contested issues.  *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001).  Specifically, the Court must find that the putative class satisfies the four prerequisites set forth in Federal Rule of Civil Procedure 23(a).  If the putative class does satisfy these prerequisites, the Court must additionally find that it satisfies the requirements set forth in Federal Rule of Civil Procedure 23(b), which vary depending upon which of three different types of classes is proposed.

It is the plaintiff's burden to prove first that an identifiable class exists that merits certification under Federal Rule of Civil Procedure 23(a).  *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006).  The four prerequisites under Rule 23(a) are: "(1) [that] the class is so numerous that joinder of all its members is impracticable; (2) [that] there are questions of law or fact common to the class; (3) [that] the claims or defenses of the representative parties are typical

---

[6] When questioned at oral argument, counsel for Alorica discussed "toggling" as a possible instance where a span of less than twenty minutes would be reflected on a CSR's login/logout data. As counsel explained, "toggling" is when a CSR logs out and quickly logs back in to jump to the end of the order for accepting an incoming call.  This practice may be a way to avoid work, and unacceptable employee behavior.  But it would still be compensable under the FLSA and Alorica's proper avenue for discouraging it would be to discipline CSRs who engage in it, not to withhold compensation.

of the claims or defenses of the class; and (4) [that] the representative parties will fairly and ade-

quately protect the interests of the class." Fed. R. Civ. P. 23(a). Class certification is not appro-

priate unless the named plaintiff establishes all four prerequisites. *Gen. Tel. Co. of the Southwest*

*v. Falcon*, 457 U.S. 147, 156, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982).

>    2. *Pre- and Post-Shift Work*

>        a. *Rule 23(a) Analysis*

Ms. Hawkins seeks certification of the following class for pre- and post-shift work under

the IWPA:

> Present and former customer service representatives who work or worked at Alo-
> rica's Terre Haute call center at any time from October 18, 2009 to the present
> and who were not paid regular wages for time spent on the following: (1) pre-shift
> work activities (including time spent pulling up computer systems) prior to log-
> ging-in to Alorica's system, and/or (2) post-shift work activities (including time
> spent on "exceptions" reports) after logging-off Alorica's system. ***This class
> shall not include any employee whom Alorica involuntarily terminated from
> employment between October 18, 2009 and October 18, 2011***.

[Dkt. 96 at 4 (emphasis in original).]

Ms. Hawkins argues that she has satisfied the prerequisites of Rule 23(a) because (1)

4,828 CSRs worked at Alorica's Terre Haute call center from October 18, 2008 to March 13,

2012 and, thus, the numerosity requirement is satisfied, [dkt. 86 at 27]; (2) the question of

whether Alorica owes its CSRs compensation for pre- and post-shift work performed while not

logged in to the phone system is common to the class and, thus, the commonality requirement is

satisfied, [*id.* at 28-30]; (3) the typicality requirement is satisfied because Ms. Hawkins was

"subject to the same written policies as her fellow [CSRs] requiring her to report prior to her

scheduled shift start to boot up her computer and stay after she logged off the telephone system

to work on 'exceptions' reports," [*id.* at 32]; and (4) she will adequately represent the class, [*id.*

at 33-36].

The Supreme Court has instructed that "the district court is to perform a 'rigorous analysis' to determine that the prerequisites of Rule 23 are satisfied when a class is to be certified because actual, not presumed, conformance with Rule 23(a) remains indispensable." *Olson v. Brown*, 2012 U.S. Dist. LEXIS 103511, *11 (N.D. Ind. 2012) (*quoting Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551-52 (2011)). Alorica does not appear to challenge Ms. Hawkins' ability to satisfy the numerosity requirement, but argues that she cannot satisfy the commonality or typicality requirements, and also that, due to her involuntary termination from Alorica, she cannot adequately represent the IWPA class.[7]  The Court will focus first on commonality and typicality.

The United States Supreme Court in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), found that the plaintiff could not maintain a class action against Wal-Mart on behalf of all of its female employees for Wal-Mart's alleged discrimination against them on the basis of their gender by denying them equal pay or promotions in violation of Title VII of the Civil Rights Act of 1964.  The Court held that plaintiffs had not satisfied Rule 23(a)'s commonality requirement because they had not adequately alleged a pattern or practice of discrimination. Specifically, the Court noted that "proof of commonality necessarily overlaps with [plaintiffs'] merits contention that Wal-Mart engages in a *pattern or practice* of discrimination.  That is so because, in resolving an individual's Title VII claim, the crux of the inquiry is 'the reason for a

---

[7] Alorica's challenge to the adequacy of representation requirement was raised for the first time at oral argument, after Ms. Hawkins initially revised her IWPA class definitions through her Reply to exclude "any [CSR] whose employment was involuntarily terminated by Alorica." [Dkt. 92 at 19-20.] Specifically, Alorica argued that Ms. Hawkins could not represent a class that she was specifically excluded from as an employee who was involuntarily terminated. Ms. Hawkins subsequently revised her class definition to exclude only those CSRs who were involuntarily terminated from employment at Alorica between October 18, 2009 and October 18, 2011, arguing that she preserved her IWPA claims, and those of the putative class, by filing her lawsuit while still an employee. [Dkt. 96 at 4-6.]

particular employment decision'…. Here [plaintiffs] wish to sue about literally millions of employment decisions at once.  Without some glue holding the alleged *reasons* for all those [employment] decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*."  *Id.* at 2552 (emphasis in original).

Here, that "glue" is similarly absent.  As discussed above, Ms. Hawkins' evidence does not establish a policy or practice of requiring CSRs to perform pre- and post-shift work without compensation and, accordingly, the Court cannot find that she has satisfied Rule 12(a)'s commonality requirement.  *See Vang v. Kohler Co.*, 2012 U.S. Dist. LEXIS 18184, *3 (7th Cir. 2012) (vacating district court's certification of class after *Wal-Mart v. Dukes*, and stating "[t]he allegation in this suit…appears to be that particular superiors regularly departed from the policy established by Kohler's top brass.  Under *Wal-Mart*…such variable circumstances do not present a common question").  At best, that evidence shows that certain supervisors may have instructed their charges along those lines, but Ms. Hawkins does not propose any sub-classes nor can the Court determine any based on the facts before it.[8]  *See Bolden v. Walsh Constr. Co.*, 2012 U.S. App. LEXIS 16439, *15-16 (7th Cir. 2012) ("*Wal-Mart* observes that it may be possible to contest, in a class action, the effect a single supervisor's conduct has on many employees….Our

---

[8] In support of her commonality argument, Ms. Hawkins relies upon cases where the court found that a policy or practice existed, and concluded that differences in the *effects* of that policy or practice did not defeat class certification.  *See, e.g., Driver v. AppleIllinois, LLC*, 2012 U.S. Dist. LEXIS 27659, *8 (N.D. Ill. 2012) (plaintiffs submitted evidence showing practice of using tipped employees in duties unrelated to their tipped occupation, and individualized issues regarding the way in which the practice affected each class member did not preclude class certification); *Ross v. RBS Citizens, N.A.*, 667 F.3d 900, 909 (7th Cir. 2012) (evidence supported existence of unofficial policy of requiring certain employees to work off-the-clock without pay, and "slight variations" in how policy was enforced did not defeat class certification because "[t]his unofficial policy is the common answer that potentially drives the resolution of this litigation").  Because the Court cannot find that a policy or practice requiring pre- and post-shift work existed, those cases are inapposite.

plaintiffs have not proposed the certification of superintendent-specific classes…[and] may choose to propose site- or superintendent-specific classes, which the district court may certify if all requirements of Rule 23(a) and Rule 23(b)(3) are met"). *Cf. Kernats v. Comcast Corp.*, 2010 U.S. Dist. LEXIS 112071, *15-16 (N.D. Ill. 2010) (email asking managers to communicate to employees that they are not allowed to perform pre-login work, coupled with data analysis demonstrating that "a significant number of [employees] were completing [pre-login work] before their scheduled start time" and policy of measuring productivity based on percentage of time logged on to system that employee was available to accept calls (which, plaintiffs argued, encouraged employees to perform uncompensated work outside scheduled work hours), was enough to satisfy Rule 23(a)'s commonality requirement based on company-wide policy).

Because the Court finds that Ms. Hawkins has not satisfied Rule 23(a)'s commonality requirement, it need not reach the issue of whether she has satisfied that Rule's other requirements in connection with the pre- and post-shift work class. Ms. Hawkins' motion to certify the IWPA pre- and post-shift work class is denied.[9]

### 3. Unpaid Breaks

#### a. Rule 23(a) Analysis

Ms. Hawkins seeks to certify the following class:

> Present and former customer service representatives who work or worked at Alorica's Terre Haute call center at any time from October 18, 2009 to the present and who, as shown by Alorica's records it identifies as "LOGIN/LOGOUT DATA," were not timely paid regular wages on one or more occasions for time spent in a work rest period or break of less than twenty minutes. ***This class shall not include any employee whom Alorica involuntarily terminated from employment between October 18, 2009 and October 18, 2011.***

---

[9] Because Ms. Hawkins has not satisfied the requirements of Rule 23(a), the Court also need not address whether Ms. Hawkins has met the requirements of Rule 23(b)(2) or 23(b)(3), under which she seeks certification of her IWPA pre- and post-shift work class. [Dkt. 36 at 1-2.]

[Dkt. 96 at 4-5 (emphasis in original).]

Ms. Hawkins argues that: (1) numerosity is satisfied because 4,828 CSRs have worked at Alorica during the relevant time period, and they were all subject to Alorica's policy and practice requiring employees to log off the clock when taking an unscheduled rest break, [dkt. 86 at 27]; (2) commonality is satisfied because Alorica has admitted that it had a policy and practice of requiring CSRs to log off to take unscheduled breaks, [*id.* at 30]; (3) typicality is satisfied because the login/logout data confirms that Ms. Hawkins, like her colleagues, logged out for unscheduled breaks of less than twenty minutes, and was not compensated for them, [*id.* at 33]; and (4) she is an adequate class representative, [*id.* at 33-36].

Alorica does not dispute Ms. Hawkins' assertion that she has satisfied the numerosity requirement,[10] but rather focuses on commonality, typicality, and adequacy of representation. The court will address each requirement in turn.

### i.   *Commonality*

Alorica argues that Ms. Hawkins cannot rely upon the login-logout data to establish a common injury related to unpaid breaks because the data does not indicate the reason a particular

---

[10] The Court does have some concerns with numerosity, as it is difficult to tell at this stage of the litigation whether the login/logout data will indicate that, even in the face of a policy requiring CSRs to log out for unscheduled breaks of less than twenty minutes, a significant number of CSRs were, in fact, taking those additional, unscheduled breaks. The Court notes that Ms. Hawkins requested login/logout data for all Alorica employees for the relevant time period, and ultimately filed a Motion to Compel production of that data, [dkt. 73]. On July 20, 2012, the Magistrate Judge ordered production of login/logout data for 960 CSRs, [dkt. 88 at 2], but the Court is not aware of whether that production has taken place yet. So, while Ms. Hawkins did present evidence of the total number of CSRs employed by Alorica during the relevant time period, [dkt. 86 at 27], without information from a larger sampling of the login/logout data it is difficult to determine how numerous the class would be. Because Alorica – the possessor of the relevant data – has not challenged numerosity, however, the Court will not either. *See, e.g., Greenlaw v. United States*, 554 U.S. 237, 243-44 (2008) ("[W]e rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present....Our adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief").

CSR was logged out and because individual managers had discretion to monitor CSRs' break usage in their own way.  [Dkt. 89 at 43.]  As discussed above in connection with Ms. Hawkins' FLSA unpaid break class, the Court finds that Ms. Hawkins has set forth sufficient evidence to establish a policy or practice throughout the Terre Haute call center of requiring CSRs to log off of the phone system prior to taking an unscheduled break of less than twenty minutes and, thus, not compensating CSRs for those breaks.  *See Stoll v. Kraft Foods Global, Inc.*, 2010 U.S. Dist. LEXIS 92930, *14-15 (S.D. Ind. 2010) (a "common nucleus of operative fact" generally fulfills the commonality requirement, and "[t]his common nucleus is typically found 'where the defendant has engaged in some standardized conduct toward the proposed class members'") (*quoting Mejdreck v. Lockformer Co.*, 2002 U.S. Dist. LEXIS 14785, *8-9 (N.D. Ill. 2002)).  Alorica has not submitted evidence indicating otherwise and, while it disputes that the login/logout data is an accurate measure of those unscheduled, unpaid breaks, it has not suggested any plausible situations where the data will reflect a break of less than twenty minutes that should not be compensated.  The commonality requirement is satisfied.

*ii.*     *Typicality*

In connection with the typicality requirement, Alorica asserts that Ms. Hawkins' claims are not typical of other CSRs' claims because "some CSRs never exceeded allotted break times, some frequently stayed logged in to the phone system despite exceeding allotted break times, and some always logged out of the phone system after exhausting their allotted break times for the day."  [Dkt. 89 at 45.]  Because the proposed class is limited to those CSRs who, as identified by the login/logout data, did in fact log out of the phone system to take breaks of less than twenty minutes, any differences between Ms. Hawkins and CSRs who did not take such breaks are irrelevant as those CSRs would not be members of the class.  The Court finds that Ms. Hawkins'

- 24 -

claims are typical of the putative class members.  *See De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) ("'A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory'") (citation omitted).

### iii.    Adequacy of Representation

Under Rule 23(a)(4), the representative plaintiff must "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  This means that the class representative "(1) cannot have antagonistic or conflicting claims with other class members; (2) must have a sufficient interest in the outcome of the litigation to ensure vigorous advocacy; and (3) must retain counsel that is competent, experienced, and generally able to vigorously conduct the proposed litigation."  *Stoll*, 2010 U.S. Dist. LEXIS 92930 at *17.

Alorica argued in connection with Ms. Hawkins' original IWPA class definitions that Ms. Hawkins could not represent putative class members who were involuntarily terminated from Alorica since they would first need to present their claims to the Indiana Department of Labor under the Indiana Wage Claims Act ("IWCA").[11]  Ind. Code Ann. § 22-2-9-4.  Ms. Hawkins then amended her IWPA class definitions to exclude any CSRs whose employment was involuntarily terminated by Alorica, [dkt. 92 at 19-20], but Alorica then argued at the hearing on Ms. Hawkins' class certification motions that, since Alorica involuntarily terminated Ms. Hawkins in late April 2012, she would not be a member of the class herself and thus was an inadequate class representative.

---

[11] Alorica does not challenge Ms. Hawkins' counsel's request to be appointed as class counsel, [dkt. 86 at 35-36], and based on the Court's familiarity with counsel, the Court finds him competent to serve in that role.

In an attempt to alleviate those concerns, Ms. Hawkins amended her IWPA class definitions again to exclude "any employee whom Alorica involuntarily terminated from employment between October 18, 2009 and October 18, 2011." [Dkt. 96 at 4.]  She argued that this limitation cures any problems with her prior class definitions because the relevant focus for whether an employee should sue under the IWPA (for current employees or employees who voluntarily terminated their employment) or the IWCA (for involuntarily terminated employees) is his or her status at the time the lawsuit is filed, and her filing of the lawsuit while she was an employee "preserved [IWPA claims] for all other Alorica [CSRs] who have worked from October 18, [2011]¹² to the present.  [Dkt. 96 at 2-6.]  While Alorica does not dispute that the relevant focus is the plaintiff's status at the time the lawsuit is filed and that Ms. Hawkins' individual claims are properly brought under the IWPA rather than the IWCA, [dkt. 97 at 2], it argues that her status as a current employee on the date the lawsuit was filed cannot be imputed to other putative class members who were involuntarily terminated after that date, [*id.*].

The Court agrees with Alorica that Ms. Hawkins cannot assert IWPA claims on behalf of CSRs who were involuntarily terminated after October 18, 2011.  The purpose of the IWCA's requirement that claims first be brought to the Department of Labor is "to create a barrier to claims to be filed in court," and "a claim must work its way through the proper channels – the DOL and, if need be, the Attorney General – before it may be brought into court."  *Lemon v. Wishard Health Servs.*, 902 N.E.2d 297, 301 (Ind. Ct. App. 2009).  While it does not appear that an Indiana state or federal court has considered the precise question at issue here, the Court finds that allowing Ms. Hawkins to impute her status as a current employee when the lawsuit was filed

_____

¹² Ms. Hawkins actually states that the filing of the lawsuit preserved IWPA claims for all CSRs who have worked from October 18, *2009* to the present, but the Court assumes she meant *2011* since she specifically excludes CSRs who were involuntarily terminated between October 18, 2009 and October 18, 2011 from her proposed class.  [Dkt. 96 at 4-6.]

for purposes of her IWPA claims to putative class members that were later involuntarily termi-

nated (and would, individually, have IWCA claims) would frustrate the IWCA's purpose. *Id.* at

301 ("We are not persuaded that permitting one individual's claim to serve as a stand-in for hun-

dreds of others is an adequate substitute for this individualized review provided for by the stat-

ute"); *see also Reel v. Clarian Health Partners, Inc.*, 917 N.E.2d 714, 720 (Ind. Ct. App. 2009)

("[T]he act of filing a putative class action does not enable the putative class members to subvert

the statutory requirements [of the IWCA]").  Accordingly, the Court will consider a redefined

IWPA unpaid breaks class of:

> Present and former customer service representatives who work or worked at Alo-
> rica's Terre Haute call center at any time from October 18, 2009 to the present
> and who, as shown by Alorica's records it identifies as "LOGIN/LOGOUT DA-
> TA," were not timely paid regular wages on one or more occasions for time spent
> in a work rest period or break of less than twenty minutes.  This class shall not in-
> clude any customer service representative whose employment was involuntarily
> terminated by Alorica, except for those who filed lawsuits against Alorica under
> the Indiana Wage Payment Act for unpaid breaks while they were Alorica em-
> ployees and prior to their involuntary termination.

### b.   *Rule 23(b) Analysis*

Having found that Ms. Hawkins has satisfied the requirements of Rule 23(a) in connec-

tion with her IWPA unpaid breaks class, the Court turns to the question of whether she has satis-

fied the requirements of one of the subsections of Rule 23(b).

### i.      *Rule 23(b)(2)*

Ms. Hawkins seeks certification under Rule 23(b)(2), which states that:

A class action may be maintained if Rule 23(a) is satisfied and if:

(b)(2) the party opposing the class has acted or refused to act on grounds that ap-
ply generally to the class, so that final injunctive relief or corresponding declara-
tory relief is appropriate respecting the class as a whole.

The Court declines to certify an unpaid breaks class under Rule 23(b)(2) because that class seeks primarily monetary damages that are not just "incidental" to the requested declaratory relief but will require an individualized analysis to determine the damages each putative class member is entitled to.  *See Donovan v. St. Joseph County Sheriff*, 2012 U.S. Dist. LEXIS 63847, *20 (N.D. Ind. 2012).  Additionally, the proposed class definition under Rule 23(b)(2) includes former CSRs, [dkt. 36 at 1], who do not have a claim for injunctive relief since they are no longer Alorica employees.  Accordingly, the Rule 23(b)(2) class definition is improperly overbroad.

        *ii.*       *Rule 23(b)(3)*

Ms. Hawkins also seeks certification under Rule 23(b)(3), which provides that:

A class action may be maintained if Rule 23(a) is satisfied and if:

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to these findings include:
      (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
      (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
      (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
      (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).  "'Considerable overlap exists between Rule 23(a)(2)'s commonality prerequisite and 23(b)(3).  Rule 23(a)(2) requires that common issues exist; Rule 23(b)(3) requires that they predominate.'"  *Mejdreck*, 2002 U.S. Dist. LEXIS 14785 at *17-18 (*quoting Demitropoulos v. Bank One Milwaukee, N.A.*, 915 F.Supp. 1399, 1419 (N.D. Ill. 1996)).

Alorica argues that because "[t]he independent inquiries into which CSRs logged out of the phone system on certain occasions, and the reasons for such log outs, after exceeding their allotted break time" would predominate, Ms. Hawkins cannot satisfy Rule 23(b)(3).  [Dkt. 89 at

48.]  As discussed above, however, Alorica's arguments are without merit.  First, the unpaid breaks class only includes those CSRs who did, in fact, log out of the phone system for periods of less than twenty minutes.  Any inquiry regarding who those CSRs are will take place at the outset, when determining membership in the class.  Second, while Alorica has argued that the login/logout data does not reflect the reason for each logout, it has not presented any evidence indicating any scenarios that might exist where a CSR has logged off for less than twenty minutes and *should not* be paid.  Without evidence that the reason for the logout matters, the reason is not an individualized issue – indeed, it is not an issue at all.

Accordingly, the Court finds that the common issue regarding Alorica's alleged policy and practice throughout the Terre Haute call center of requiring CSRs to log off the phone system while taking unscheduled breaks of less than twenty minutes, and thus not compensating them for those breaks, predominates over any individualized issues that might exist.  The Court grants Ms. Hawkins' motion to certify the IWPA unpaid breaks class under Rule 23(b)(3), subject to the revisions to the class definition that have been noted.

### III.
#### CONCLUSION

For the foregoing reasons, Ms. Hawkins' Motion to Certify Combined Class Action and FLSA Collective Action (related to pre- and post-shift work), [dkt. 36], and her related Motion for Approval of Class and Collective Action Notice, [dkt. 38], are **DENIED**.  Ms. Hawkins' individual pre- and post-shift work claims under both the FLSA and the IWPA will proceed.

Ms. Hawkins' Supplemental Motion to Certify Combined Class Action and FLSA Collective Action (related to unpaid breaks), [dkt. 77], is **GRANTED** with revised class definitions as noted below.  The Court **CONDITIONALLY CERTIFIES** the following class under the FLSA:

Present and former customer service representatives who work or worked at Alorica's Terre Haute call center at any time from October 18, 2008 to the present and who, as shown by Alorica's records it identifies as "LOGIN/LOGOUT DATA," were not paid regular wages and/or overtime compensation on one or more occasions for time spent in a work rest period or break of less than twenty minutes.

The Court also **CERTIFIES** the following class under the IWPA:

Present and former customer service representatives who work or worked at Alorica's Terre Haute call center at any time from October 18, 2009 to the present and who, as shown by Alorica's records it identifies as "LOGIN/LOGOUT DATA," were not timely paid regular wages on one or more occasions for time spent in a work rest period or break of less than twenty minutes.  This class shall not include any customer service representative whose employment was involuntarily terminated by Alorica, except for those who filed lawsuits against Alorica under the Indiana Wage Payment Act for unpaid breaks while they were Alorica employees and prior to their involuntary termination.

Ms. Hawkins' Revised Motion for Approval of Class and Collective Action Notice, [dkt. 79], is **DENIED** and the Court **ORDERS** the parties to meet and confer, and by **October 17, 2012** submit a joint report in this matter setting forth a proposed plan (or alternative plans) as to what notice, in light of the Court's Order, should be provided to the classes.

Further, the Court **DESIGNATES** Renee M. Hawkins as the representative plaintiff and, pursuant to Fed. R. Civ. P. 23(g), **DESIGNATES** Robert P. Kondras, Jr. of Hunt, Hassler & Lorenz LLP as lead class counsel.

09/25/2012

_Jane Magnus-Stinson_

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

- 30 -

**Distribution via ECF only:**


Peter N. Farley
SUTHERLAND ASBILL AND BRENNAN LLP
peter.farley@sutherland.com

Gregory W. Guevara
BOSE MCKINNEY & EVANS, LLP
gguevara@boselaw.com

Katherine  Kendricks
SUTHERLAND ASBILL AND BRENNAN LLP
katherine.kendricks@sutherland.com

Robert Peter Kondras Jr.
HUNT HASSLER & LORENZ LLP
kondras@huntlawfirm.net

Allegra J. Lawrence-Hardy
SUTHERLAND ASBILL AND BRENNAN LLP
allegra.lawrence-hardy@sutherland.com

Kurt E. Lentz
SUTHERLAND ASBILL AND BRENNAN LLP
kurt.lentz@sutherland.com

Andrew M. McNeil
BOSE MCKINNEY & EVANS, LLP
amcneil@boselaw.com